UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>ROBERT LARA )<br>) | CRIMINAL NO. 19-CR-10459-RWZ |

DEFENDANT'S APPEAL FROM MAGISTRATE'S MEMORANDUM AND
ORDER RE: PROTECTIVE ORDER ENTERED ON AUGUST 14

Pursuant to Rule 2 of the Rules for United States Magistrate Judges (D. Mass.), the defendant, Robert Lara, hereby appeals from the Memorandum and Order entered on August 14, 2020 (hereinafter: the "Order"), and seeks review by the district judge.  The Order is clearly erroneous and contrary to law because: (1) there was no basis for a finding of good cause to believe that Mr. Lara's possession of "Protected" discovery, would pose a danger to any person or class of people; (2) there has been no change in circumstances since Mr. Lara's release from custody based on an implicit finding that he would not pose such a danger; (3) he has fully complied with his conditions, including the prohibition against direct or indirect contact with any victim or witness in this case; and (4) particularly in light of the limitations imposed by COVID-19, the Order effectively deprives him of access to the discovery without good cause and interferes with the

effective assistance of counsel, by permitting him to view the critical discovery only in the presence of defense counsel.

## INTRODUCTION

The Order subjects Mr. Lara and all but three other defendants in this case to a temporary protective order ("TPO") that recognizes two categories of discovery: Unprotected and Protected. *PO*, ¶ (e). The Protected category is not defined, but it is described in the following terms:

> Protected discovery materials are typically those materials that may identify a cooperating witness, a non-law enforcement witness, or a crime victim in the case, such as police reports identifying names or addresses of civilian witnesses or victims.

*Id.*, ¶ (f). By June 8, 2020, the government had produced over 100,000 items of discovery, almost all of which it designated as Protected. *Order*, p. 4. The TPO prohibits attorneys from providing Protected materials to defendants. Released defendants, including Mr. Lara, can review such materials only in the presence of counsel or a member of the defense team. *Id.*, ¶ (g).

Mr. Lara was released on March 31, 2020. He has been working full time, eight to twelve hours a day since May 12, living with his fiancé and their children, and complying fully with his conditions of release. Those conditions require him to "avoid all contact, directly or indirectly, with any person who is or may be a

victim or witness in the investigation or prosecution. . . ." Dkt. 681.  He is in contact with his probation officer every day except Sunday.

Because of the pandemic, he has not been able to have an in-person meeting with counsel since before his release from custody.  He therefore has not been able to see any of the Protected discovery.

## GOVERNMENT'S EVIDENCE

### Detention Proceedings

The detention hearing began on December 13 and continued on December 16 and 23.  On each of these dates, Mr. Lara had five supporters in the courtroom, including his fiancé, his father, a member of the Chelsea City Council and, one day, a member of the Chelsea Police Department.

The motion for detention was based on Mr. Lara's alleged presence at "several" meetings where the use of violence against non-compliant members and renegade chapters was discussed, and his alleged participation in a single instance of violence at a meeting in March, 2019.

One the first day of the hearing, the government's evidence against Mr. Lara centered on a January 12, 2019 meeting.  Special Agent Craig Harvey identified him on the video by reference to a hand and the arm of a white jacket. *Transcript 12/13/2019*, p. 60:11-25.  His face is not seen and his voice is not heard during the video.  *Id*., p. 61:8-14.  At this meeting, leaders spoke at length about violence to

3

be imposed on non-compliant members and "renegade" chapters that were not reporting to the leadership structure. S.A. Harvey testified on cross-examination that members are required to report to meetings, or they could be subject to punishment. *Id*., pp. 64:21-25, 65:1.

On the third day of the hearing, the government presented a two-minute excerpt taken from a two-hour video recording of a March, 2019 Latin Kings meeting. The excerpt, admitted as Exhibit 3, purports to show Mr. Lara imposing a "violation," a one-minute beating, on Oscar Pena.

The full video, admitted as Exhibit 5, shows the start of the meeting and the violation of Steven ("Stevie") Familia Valdez. There is footage of an individual greeting people as they enter the hotel room for the meeting. The person's face is redacted but the voice is clearly audible, at the beginning and throughout the video. S.A. Harvey testified that the government did not want to identify the person. *Transcript, 12/23/2019*, pp. 17-18. He also testified that the greeter was the secretary of the chapter (D5K). *Id*., p. 12. The government did not move to seal the exhibits or the transcript of the hearing.

The violation of Stevie came after a long, protracted group discussion. Stevie initially refused to accept the violation, but accepted it after he was told that refusal could lead to charges and potentially an on-the-spot termination. *Id*., p. 21:3-25, p. 22:1-7. The violation began only after a Latin Kings official

4

barked at Adam Peguero that he had to violate Steve immediately, shouting that this was a direct order. *Id.*, at 23:23-25, 24:1-2. S.A. Harvey testified that failure to follow a direct order would itself be a violation and could lead to a termination, involving a beating imposed by all those present. *Id.*, p. 24:3-25. The two-minute segment the government presented against Mr. Lara began approximately an hour into the video. The threat against Adam Peguero and Stevie made clear to all present that failure to follow orders at that meeting would result in immediate, severe punishment.

The government never claimed that Mr. Lara held a leadership position with the Latin Kings, that he was involved in selling drugs, or that he had ever used or possessed a firearm. There was no claim that he has ever participated in any type of witness intimidation or retaliation against a cooperating witness.

The government's particularized statement as to Mr. Lara (Dkt. 1114, pp. 12-14) is a descriptive summary of the evidence the government had offered against him at the detention hearing, followed by speculation as to future conduct. It does not mention that he was no longer in custody.

<u>Proceedings Relating to the Protective Order</u>

In February, the government moved for entry of a restrictive blanket protective order. Dkt. 396, 396-1. The motion was denied for two main reasons. Dkt. 508. First "[t]he government's attempt to group all defendants into one

category with . . . significant restriction of discovery access suitable for only certain defendants. . . is overbroad." *Id*. Second, the proposed order made no distinction between different categories of discovery material, "grouping mundane with highly confidential material." *Id*. On March 7, the court granted a joint motion for entry of the TPO (Dkt. 703), which acknowledges an understanding that the parties would continue to litigate the terms of a subsequent order.

On May 29, 2020, six defendants filed a Motion to Compel a Particularized Showing (Dkt. 948), asking the court to order the government to demonstrate good cause against each individual defendant. Mr. Lara joined in the motion. The government filed a Response on June 19, with two exhibits: (1) a June 12, 2020 FBI memo describing a statement made that day by CW-9 in a telephone interview, and (2) the Affidavit of S.A. Harvey, dated June 19, 2020. In three nearly identical paragraphs, these documents suggest that if "any" member of the Latin Kings had access to "all" discovery, it would be transmitted to other members "immediately" or "within the hour". No order would be necessary to require members to share this paperwork, because all members are expected to share law enforcement paperwork, which is used to identify informants. Failure to share paperwork would result in a physical assault. Dkt. 1009-1, 1009-2.

The government offered no objective evidence to establish the accuracy of these statements, either in an official Latin Kings document, such as the manifesto,

6

in-house[1] or other written rules, or in communications captured in trulincs messages, emails, texts, linesheets, or meetings recorded by an informant. These types of documents indicate that members of the Latin Kings frequently refer to rules and expectations, and discuss violations. Despite the mass of material the government has, it has submitted nothing to evidence Mr. Lara's presence or participation in any discussion of a requirement to share paperwork or face a violent assault.

At a telephonic hearing held on June 30, the government submitted a thumb drive, which was admitted as Exhibit 1 and provided to defense counsel. The files on the thumb drive relating to Mr. Lara were the transcripts of the detention hearings, Exhibit 3 (the video excerpt), and the Order of Detention. On July 14, the government filed a Submission in Support of the Protective Order, stating the facts it viewed as amounting to good cause against each defendant who had joined in the motion. Dkt. 1114. The facts pertaining to Mr. Lara are nothing more than a descriptive summary of the evidence the previously admitted at the detention hearing. (*Id*., pp. 12-14). Mr. Lara filed a Reply Dkt. 1134.

---

[1] These rules require members in federal prison to provide legal documents from their own cases, to prove that they are not cooperating with the government. Defendants in custody in many cases not involving the Latin Kings have been similarly pressured to provide court papers to prove they are not informants.

## THE ORDER

The Order denied the defense motion except as to three defendants, leaving Mr. Lara and the remaining defendants subject to the TPO.[2] The Order relied in large part on Dkt. 1009-1 and Dkt. 1009-2. Apart from that, it concluded that three defendants, all incarcerated, had confirmed or attempted to confirm the identity of cooperating individuals, including one defendant who forwarded paperwork.[3] *Id*., pp. 7-8. The Order does not mention Mr. Lara, but it states that "the risk of transmission of sensitive discovery material to other Latin King members is greater in the event of a disclosure . . . to nonincarcerated defendants. . ." *Id*., p. 9.

## ARGUMENT

I.     THE ORDER AS TO MR. LARA IS CLEARLY ERRONEOUS BECAUSE THE EVIDENCE DOES NOT SUPPORT A FINDING OF GOOD CAUSE TO BELIEVE THAT MR. LARA WOULD POSE A DANGER TO ANY INDIVIDUAL IF HE WERE TO RECEIVE THE PROTECTED DISCOVERY.

The Order's finding of good cause to withhold almost all of the discovery from Mr. Lara was clearly erroneous, because there was nothing to indicate a likelihood that he would pose a danger to any person or persons if he had the

---

[2] One of those defendants was ex-communicated from the Latin Kings in the summer of 2019, and the other two were not charged in Count I, the RICO conspiracy. The government conceded that the TPO was unnecessary as to the latter two defendants. *Dkt*. 1149.

[3] That defendant, Matthew Palacios, challenged the accuracy of that evidence in a Motion for Reconsideration filed on August 26, 2020.

8

Protected discovery. Other than the government's detention evidence, which ultimately failed to keep him detained, the Order was based on generalized, self-serving, conclusory statements. He has been at liberty for nearly five months, and has fully complied with his conditions of release.

The good cause showing for a protective order under Fed. R. Crim. P. 16(d)(1) must be "based on a particular factual demonstration of potential harm, not on conclusory statements." *United States v. Bulger*, F.R.D. 46, 52 (D.Mass. 2012), *citing United States v. Wecht*, 484 F.3d 194, 211 (3rd Cir. 2007) and quoting *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 7. In considering whether to order disclosure of an informant's identity, courts balance the government's interest in protecting witnesses and victims against the fundamental right of defendants to a fair trial. *United States v. Robinson*, 144 F.3d 104, 106 (1st Cir. 1998).

The Order's reliance on Exhibits 1009-1 and 1009-2 was misplaced. Those documents are not evidence of any particular event or events involving specific, named individuals. Instead, they are self-serving, conclusory statements made by a government agent and a cooperating witness to ensure the denial of the defendants' motion, made after the court had denied an earlier government motion for protective order. If Mr. Lara had been involved in seeking proof of a cooperator's identity, the government should have been able to offer evidence of that to the court, as is did with the three defendants mentioned in the order. The undersigned

9

counsel has searched the discovery and has seen nothing connecting Mr. Lara with the sharing of paperwork or evidencing the expectation that "any" member would be expected to share paperwork on penalty of a violent attack.

 Mr. Lara is not seeking disclosure of an informant's identity; rather, he is seeking access to the relevant discovery so he can assess the evidence against him, determine how to respond to the charges, and assist in the preparation of his defense. Nearly any item of evidence "may" reveal an informant's identity to a person familiar with the facts. Anyone who was present at a meeting would likely know the identity of an informant based on a report or recording, even with the informant's face redacted. And anyone who was recorded in a phone call talking with an informant would likely know the identity of the informant after reviewing the recorded call. Most anything that is relevant to the prosecution of this case *may* reveal the identities of informants, and thus, Mr. Lara can only see material that has little if any value.

 This court released Mr. Lara despite the government's evidence. The government argued at the detention hearings that his release would pose a risk of witness intimidation just as it now argues that his possession of discovery would pose such a risk: with generalized references to events involving the Latin Kings but with no evidence specifically connecting him to those events. *Transcript 12/13/2019*, p. 83:23-25, 84:1-25, 85:1-6. The government has submitted no

evidence of any incident occurring after his release to suggest that he has been in contact with any member of the Latin Kings. It makes no sense that after being in custody in this case for close to four months before the detention order was revoked, he would now violate his conditions of release, knowing that it would again cause him to be separated from his family and lose the full time job that he managed to get in the middle of the pandemic.

    Because of COVID-19, he cannot attend a lengthy meeting with counsel and review the massive volume of Protected discovery in counsel's presence. He cannot see the government's photographs of himself or recordings of his own voice because they are contained in items marked Protected. In effect, he has no access to the critical evidence the government will likely present against him at trial. While he is enjoying the freedom that results from the revocation of the detention order, that freedom has come at a heavy price: a near-total lack of access to the evidence.

    For the reasons set forth herein, this court should vacate the TPO as it applies to Mr. Lara.

WHEREFORE, the defendant, Robert Lara, respectfully requests this Honorable Court to vacate the Memorandum and Order dated August 14, 2020 as to Mr. Lara.

Respectfully submitted,

ROBERT LARA
By his Attorney,


/s/Leslie Feldman-Rumpler
Leslie Feldman-Rumpler
Attorney-at-Law
BBO # 555792
229 Harvard Street
Brookline, MA  02446
(617) 728-9944
Leslie@feldmanrumplerlaw.com


CERTIFICATE OF SERVICE

I, Leslie Feldman-Rumpler, hereby certify that I have served a copy of the within motion on all parties by causing it to be filed electronically via ecf.

| August 28, 2020 | /s/Leslie Feldman-Rumpler |
|---|---|
| Date | Leslie Feldman-Rumpler, Esq. |